# United States District Court, District of Maryland

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

· 2011 MAR 28  A 10: 36 ·

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY ·

Ferenc K. Csabai
John D. Miles
Margaret Miles
David Smith
Curtis J. Landsberger
Anna Dale
Michael Scardigno
    Pro Se Plaintiffs

                    Complaint-Jury Trail Demanded
        Vs.


Martek Biosciences      Civil Action No. 1:11-cv-00316
Steve Dubin                                        WDQ
Pete L. Buzy                                        CCM
6480 Dubbin Rd
Columbia, MD 21045


Henry Linsert, Jr.
Columbia Biosciences
6440 Dobbin Road, # D
Columbia, MD 21045


Robert J. Flanagan
Clark Enterprises Inc
7500 Old Georgetown Road
Bethesda, MD 20814-6195


Attn: Hugh C. Welsh
President/General Counsel
DSM North America
45 Waterview Boulevard
Parsippany, NJ 07054

CCB/WDQ 11cv0316, Csabai et al vs Martek/DSM et al

Case WDQ 11cv0316 filed February 4, 2011 is the only
complaint ever filed, continued with this response, that
accurately exposes the long term securities frauds
perpetrated by Martek Biosciences insiders. In order to
prove the long term securities fraud(s), the long term
scienter required to illegally pay/benefit the
perpetrators, Martek's executives/board plus their
corporate partners, information had to be derived from 3rd
party sources from late 2008, 2009, 2010 and 2011
contradicting nearly every material real time and potential
commercial claim aggressively made to Martek's public
securities market investors from at least 1998 to the
present.
<u>Combined, all that recent proof was essential to attain the
required high bar of proof set by the courts to prove
scienter in securities fraud cases.</u> The supreme court added
clarity for securities fraud with it's Merck & Co., vs
Reynolds, Case 08-905, opinion of April 27, 2010.

The most appropriate venue to prosecute this case would be
through the SEC under their illegal insider trading
provisions. Martek's been an illegal insider trading ring
for years based not only on years of concealment of
material failures, barriers and problems, which would have
exposed the very core of their commercial claims to

investors to be fraudulent, but also an additional intent
of scienter by replacing all insider real time knowledge of
commercially damaging/limiting scenarios/facts with
fraudulent claims of impressive growth results and growth
expectations that were insider known to be materially
inaccurate aberrations and impossible commercial viability
from 1999 and on. Martek essentially created a fraudulent
commercial profile by continuingly disclosing materially
false information and materially manipulating known
aberrated results to reflect material commercial gains
supported with massive costly buying and building of plant
and equipment to cover up yet another undisclosed material
problem. Since the cover up phase of Martek's aggressive
frauds began in 2005 after the massive unusable plant and
equipment buy and build out was completed, including Martek
undisclosed lowering it's prices to it's major partners in
2006 and 2007, Martek executives and board changed their
stock compensation plan to issuing themselves zero cost
basis stock grants. Since 2007 Martek's stock compensation
plan issued themselves another round of free no risk stock
compensation of 1,004,140 shares and former OmegaTech
shareholders were issued 340,946 shares, October 2007,
based on the commercial failure of the undisclosed
September 2002 National Academy of Sciences based on the
undisclosed July 17, 2007 4th circuit appeals court opinion.
The 1,345,086 Martek shares represent an addition free 4.2%
ownership, representing another risk less and costless

$42,370,209.00 in free profit based on the $31.50/share 2010/2011 DSM deal, of Martek's January 9, 2007 was 32,194,628 common stock outstanding when the free money was once again, in addition to the other materially raised compensation, initiated to secure loyalty for the continued cover up, as with Martek's undisclosed EFSA material efficacy claim failure for DHA/ARA in formula some time in 2008.

This latest round of free equity of about $42 million is on top of the $72 million illegal insider profits from 2000 through 2005 when the most aggressive frauds were being perpetrated to permanently fraudulently change Martek's commercial profile, complete with useless addition of massive plant and equipment to conceal the toxic air pollution restriction/problem, without consideration of profits generated by the OmegaTech 6 with their 696,741 Martek shares. Robert Flanagan, most recent chairman of the board and Vice President of Clark Enterprises which was issued the no bid massive Martek construction contract, one of the OmegaTech 6. Flanagan is also a member and a manager of CNF investments which held 332,609, position into the DSM deal, shares of Martek, about $10.5 million at $31.50, which was issued off the OmegaTech deal. OmegaTech a company whose, contrary to Martek's years of aggressive fraudulent hype, could serve only intellectual property defensive strategy in conjunction with Martek whose

commercial viability was doomed as a stand alone company.
The public securities markets were used as a dumping ground
to secure illegal costless and risk less profits for
insiders and costless and risk less capital for their
corporate partners ongoing corporate strategies totally
independent of any benefit to Martek's public market
investors but those material strategies relied entirely on
Martek's public market investment capital. Martek's entire
public market existence was set up to benefit the insider
group with all the profit and material benefit while
Martek's public market investors took on undisclosed
material risk with constant manipulation of all of Martek's
investment data.

While in it's simplest definitional form Martek Biosciences
is an illegal insider trading ring but the SEC has limited
resources and an extraordinary pick of high profile low
hanging fruit to prosecute in the current illegally ravaged
dysfunctional securities environment where Wall Street's
top people and institutions are charged and convicted,
settle, of defrauding their investors routinely. To prove
the Martek securities fraud case required real time
continual knowledge through 2011, based on evidence exposed
from 2008 to 2011, with solid knowledge of Martek's history
as far back to at least 1998 when the most aggressive
fraudulent acts to permanently change Martek's commercial
profile to a fraudulent mega growth profile began and has

since accelerated fraudulently securing the end game for Martek's partner's corporate restructuring and providing Martek's executives, board members and other insider cronies the ability to generate $100's of millions in free profit at the expense of Martek's public securities market investors. Martek's executives and board were only in place to secure their corporate partner's insider needs while getting paid $100's of millions by the very same Martek pubic securities market they were defrauding. Martek's partners ran Martek's business, Martek's executives and board defrauded the public market for the capital.

Recent cases filed against Martek supporting our complaint.

Dodi L. Rubenstein (**Case WDQ 1:2011cv00321** filed 2/5/2011-settled 2/14/2011) Complaint for Breach of Fiduciary Duties

BNLfood Investment SNRL (**Case WDQ 1:2011cv00446** filed 2/17/2011) Antitrust complaint

Recent case filed against the use of Martek's DHA/ARA oils in organic products. While this case deals with the lower hanging legal fruit of Martek's DHA/ARA and DHA oils relative to organic uses by Martek's customers/partners there are parallels to how Martek tried to manipulate the FDA with it's undisclosed November 2003 petition claiming .025 PPM of mercury or greater for fish and fish oils,

Martek's much cheaper and more scientifically established competition, should require a warning label when Martek's DHA and ARA each had higher PPM of mercury without considering the n-hexane, neurotoxin, residual content for it's DHA/ARA oils in U.S. formula and Martek's DHA-S, it's alleged multi application adult DHA-S also had higher,

.025 PPM mercury claimed as the residual requested limit of Martek's petition to the FDA, with undisclosed 20 PPM of n-hexane residual. Also, in Martek's redundant GRAS claim for it's OmegaTech acquired DHA-S Martek fraudulently claimed success in their September 9, 2004 news of the FDA's cardiovascular qualified health claim for omega-3's, requirement to have both DHA & EPA combined, when Martek's DHA-S GRAS claim only included Docosahexaenoic acid, DHA, and Docosapentaenoic acid (DPA(n-6))fatty acids and made no claim regarding the EPA, Eicosapentaenoic acid, as required for the FDA cardiovascular health claim announced September 8, 2004.

Center for Food Safety ( **Case EDL 3:2011cv01310** filed 3/18/2011)

**Letter Responding to Health Claim Petition dated November 3, 2003 (Martek Petition): Omega-3 Fatty Acids and Reduced Risk of Coronary Heart Disease (Docket No. 2003Q-0401)**

September 8, 2004

Mr. Martin J. Hahn
Hogan & Hartson, L.L.P.
Columbia Square
555 Thirteenth Street, NW

Washington, DC 20004-1109

RE: Health Claim Petition: Omega-3 Fatty Acids and Reduced Risk of Coronary Heart Disease (Docket No. 2003Q-0401)

Dear Mr. Hahn:

This letter responds to the qualified health claim petition dated November 3, 2003, submitted to the Food and Drug Administration (FDA or the agency), on behalf of Martek Biosciences Corporation (Martek petition) in accordance with the interim procedures for review of qualified health claims described in FDA's July 10, 2003 guidance for procedures on qualified health claims.

**Toward the end of the FDA's 35 page response**

## V. Fish and Mercury

FDA received a few comments specific to the safety of fish and fish oils. The Martek petition stated that the presence of mercury in fish can harm the developing nervous systems of unborn children, infants, and young children, and therefore, the presence of mercury in fish and fish derivatives needs to be addressed in the health claim. The Martek petition referenced the March 2004 FDA advisory that cautions pregnant women, women who might become pregnant, nursing mothers and young children against the consumption of certain fish, and that suggests limits to weekly intake of other fish and shellfish. Specifically, the Martek petition stated that certain fish (including shark, swordfish, king mackerel, and tile fish) and other fish that similarly become included in a future FDA advisory

should be ineligible to bear the proposed health claim. The
Martek petition further suggested that when the health
claim appears on other fish, it should be accompanied by an
advisory statement suggesting a limited weekly intake for a
vulnerable population of pregnant women, women of
childbearing age, nursing mothers, and young children. In
addition, the Martek petition stated that sources of omega-
3 fatty acids derived from fish (such as fish oils) should
be ineligible for the health claim unless the oil has been
tested and found to contain less than 0.025 ppm of mercury.
Finally, the Martek petition stated that the presence of
mercury may offset the cardio-protective effects of omega-3
fatty acids, and therefore, that the claim would be
misleading if it appeared on fish that contained elevated
levels of mercury. The Martek petition stated that the
mercury specific limitations and the advisory language
would be needed to ensure that the claim is truthful and
not misleading under sections 403(a) and 201(n) of the Act.


### Submitted to FDA August 18, 2003
### Re: GRAS Exemption Claim for DHA Algal Oil Derived from *SchizochytAurn* sp. as a Source of DHA for Use in Foods


"All fatty acids present in DHA Algal Oil are components of
a normal diet or normal metabolites of fatty acids.
**Recommended use levels will only increase the consumption**
**of two component fatty acids, DHA and docosapentaenoic acid**
**(DPA(n-6)), above that currently consumed from the diet.**

A comprehensive discussion on the safety of the fatty acid components present in DHA Algal Oil derived from *Schizochytriurn* sp. algae along with knowledge of the absorption, distribution, metabolism and excretion of the fatty acids and published safety information on these and similar compounds have previously been provided to the agency as part of a **New Dietary Ingredient Premarket Notification filed in December 1997 by Monsanto for SeaGoldTM DHA-rich oil which is the same oil that is the subject of this GRAS notification."**

Regardless of the regulatory environment, regulatory bodies such as the FDA, SEC and the over all legal system seem to be nothing more than situations to be fraudulently manipulated for the benefit of Martek's insiders and it's corporate partners. The frauds and schemes supported one another making the sum greater than it's parts relative to it's effect of public market investor's belief of Martek's commercial profile.

In order to make claims of securities fraud, provable scienter for Martek Biosciences' case, evidence is mostly from 3rd party sources which leads us back to all of Martek's own SEC filings, news and conference calls, 3rd party information discovered in late 2008, 2009, 2010 and 2011 which exposed the realities of Martek's undisclosed material failures going back to 1999. Martek's material failures were not only very effectively covered up, concealed, but were replaced by consistent and very aggressive fraudulent claims of products, markets and applications growth that could and would never be accomplished due to the series of undisclosed material

failures, barriers and problems that would have exposed
Martek as a fraudulent growth company investment story,
Martek's only investment value was all it's fraudulent
claims.

**As plaintiff's in a securities fraud case where not only
the proof of wrongdoing is required but the intent to
defraud, as a state of mind, needs to be proved as well
only the ongoing consistent fraudulent behavior of the
defendants coupled with consistent factual evidence will
satisfy the courts. Based on continued newly exposed
evidence from 3rd party sources from late 2008 through 2011
coupled with Martek's own fraudulent versions used as legal
disclosure to it's investors there can be no doubt of
ongoing scienter proving the plaintiff's case of long term
securities frauds by the defendants and their cronies.**

**The Martek formula market size frauds**
Martek's commercial application was limited to and driven
only by it's partners **Mead Johnson**, formerly a division of
Bristol Myers, **Ross**, a division of Abbott Labs, **Wyeth**,
formerly American Home Products, **Wyeth** existed the U.S.
formula business in 2005, and **DSM**, current Martek parent as
of March 2011 but was Martek's largest supplier producing
nearly all of Martek's ARA oils. The desperation of
crucially needed higher formula margin/profit was driven by
DHA/ARA formula for the U.S. formula industry by Mead, Ross

and Wyeth, while Wyeth's market share was 4th behind
Nestle's 6% U.S. market share it's importance was with the
store brands representing the lowest cost U.S. formulas,
drove the supply driven conversion, making aggressive
claims of unproven brain-eye-growth infant development
benefits, fraudulently marketing the U.S. formula market to
the higher priced DHA/ARA formula standard for all the
U.S.. Martek's 3 formula producing partners, Mead, Ross and
Wyeth, controlled over 90% of the U.S. formula market share
driving the supply driven conversion to Martek's much
higher priced DHA/ARA oils in formulas.

**Martek DHA/ARA Revenue to formula partners/customers**

| 2009 | 2008 | 2007 |
|---|---|---|
| $285.7 mil | $300.7 mil | $265.6 mil |
| Mead 30% $85.7 M | 36% $108.2 M | 42% $111.5 M |
| Ross 20% $57.4 M | 19%   $57.1 M | 18% $47.81 M |

 Ross uses about 55% of Meads DHA/ARA oil content in Ross's
formulas so their Martek DHA/ARA purchases represents
nearly double the formula market share, so they are
effectively at about the same sales levels as Mead Johnson.
         **★★★★★★★★★★★★★★★★★★★★★★★★★★★★**
**Ross's 55% Martek DHA/ARA use factor.**

| 2009 | 2008 | 2007 |
|---|---|---|
| $ 104.3 M | $ 103.8 M | $ 86.9 M |

Spike in sales has more to do with who wins the
significantly sized WIC contracts Mead vs Ross, Ross uses
55% of Martek's DHA/ARA oils as does Mead Johnson.

**★★★★★★★★★★★★★★★★★★★★★★★★★★★★★★**

|  | 2009 | 2008 | 2007 |
|---|---|---|---|
| Nestle | 12% $34.2 M | 12%  $36.0 M | 11% $29.2 M |
| Pfizer/Wyeth | 8%  $22.9 M | 9%  $27.0 M | 9% $23.9 M |
| Danone/Numico | 7% $20 M | 5% $15 M | 4% $10.6 M |

Nestle accounted for approximately 12%, 12% and 11% of our
total product sales in fiscal 2009, 2008 and 2007,
respectively. Pfizer (formerly Wyeth) accounted for
approximately 8%, 9% and 9% of our total product sales in
fiscal 2009, 2008 and 2007, respectively. Danone (formerly
Numico) accounted for approximately 7%, 5% and 4% of our
total product sales in fiscal 2009, 2008 and 2007,
respectively.

**Martek DHA/ARA Revenue to formula partners/customers**

| 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|
| $ 240.5 M | $ 189.0 M | $ 170.6 M | $ 111.3 M | $ 45.9 M |

**Once Mead Johnson has stuffed the U.S. formula channels
from 2002 through 2005 Martek revenue growth slow down drastically
and there is no EPS growth, flat to down 2005, 2006, 2007. Mead
in a hurry to be able to spin off from Bristol Myers.**

| Mead buys Martek oils | % of Martek | Total DHA/ARA Revenue |
|---|---|---|
| 2001 | $ 4,800,000.00 | 30% | $16,000,000,00 |

**U.S. Channel stuffed years from late 2002 through mid 2005**

| | | | |
|---|---|---|---|
| 2002 | $22,032,000.00 | 48% | $45,903,000.00 |
| 2003 | $65,400,090.00 | 59% | $111,294,890.00 |
| 2004 | $93,810,750.00 | 55% | $170,565,000.00 |
| 2005 | $92,659,000.00 | 49% | $189,100,000.00 |

Based on the November 29,2004, Martek's fiscal 2005 <u>marked as
confidential business information exposing the April 27, 2005
hoarding fraudulently orchestrated hoarding CC for the cover up
it was,</u> permit to the Commonwealth of Kentucky Division of Air
Quality marks the success of the fraudulently claimed buying and
building of massive capacity, based on fraudulently claimed
demand, to over come the undisclosed toxic pollution and
fraudulently claimed purity of Martek's DHA and ARA oils.

Mead starts it's aggressive push into foreign markets with
Martek's DHA/ARA in formula armed with it's undisclosed lower
pricing from Martek. Mead responsible $15.5 M of the total $18.4
Martek gain in revenue

| | | | |
|---|---|---|---|
| 2006 | $108,225,000.00 | 45% | $240,500,000.00 |
| 2007 | $111,552,000.00 | 42% | $265,600,000.00 |
| 2008 | $108,200,000.00 | 36% | $300,700,000.00 |
| 2009 | $ 85,700,000.00 | 30% | $285,700,000.00 |

The initial jump in revenue from Mead, in spite of <u>undisclosed
lower prices from Martek from 2006 and beyond to it's Mead
Johnson partner etc.,</u> purchases for 2006 and 2007 represents the
same strategy that Mead Johnson used in it's aggressive U.S.
channel stuffing of 2003 and 2004 for new DHA/ARA formulas making

Martek's claims of a 50%/50% U.S./international revenue for their
DHA/ARA in formula one of it's fraudulent claims. That same
strategy was used by Mead for it's introduction of Martek DHA/ARA
formulas in new foreign markets. The 2009 Mead Johnson purchases
of $85.7 million of Martek's oils reflects the undisclosed
materially significant benefit Mead  Johnson received in pricing
from Martek based on the consistency of Ross's and Nestle's
purchases in 2007, 2008 and 2009.  These undisclosed material
commercial realities are just another example of the ongoing
frauds perpetrated by Martek's insiders against their own
investors for the benefit and profit of their corporate partners
and the executives and board. In an 8-K filed for the Deutsche
Bank 32nd Annual Health Care Conference on May 2nd & 3rd, 2007
Martek was still claiming, in spite of undisclosed reduced
revenue realities, potential for a $475-$525 million total
formula revenue opportunity tempered from the $550 million,
raised from the previous $400 million revenue potential during
2003, they were pumping during the 4 years of the "can't meet
demand" buying and building story to complete the "$750 million
or better" run rate with a high % mothballed in 2006 and sold in
2010 for the DSM deal while Martek was running at less than 50%
capacity. Martek was never going to attain the initial alleged
potential formula opportunity of $400 million based on the
insider plan to initially flood the regular U.S. formula
market with Martek's DHA/ARA from 2002 though 2004 while
aggressively converting the WIC formula bidding process to
only the higher priced DHA/ARA formulas from the August

2003 California WIC contract, see exhibit D of initial
complaint, and beyond to raise prices for over 50% of the
total U.S. formula purchased by the government through the
WIC formula state bidding process.

December 29, 2008 filed 10-K they disclosed market size,
U.S. $4.5 billion   Worldwide $15 billion.

Based on that U.S. market size @ 100% DHA/ARA would be about
$200-$250 million in revenue just off the U.S. market, if
Martek didn't keep dropping prices to it's partners, since
Martek was once again making claims of a 50%/50%
U.S./international distribution of it's DHA/ARA based on
growth in the over seas markets. With Martek's formula
DHA/ARA revenue $300 million in 2008, $285 million in 2009
and $317 million in 2010 it looks like the 2006 and 2007
new agreements with it's partners/customers had material
undisclosed negative effects on it's only real commercial
opportunity, DHA/ARA in formula, making that $475-$525
impossible without even considering the claimed
applications for the fraudulently hyped OmegaTech DHA-S for
the adult market that never existed or could be developed.

Without being able to back into numbers with some known data
such as Martek finally acknowledging the 100% DHA/ARA U.S.
formula market standard in it's 2008 10-K filed December
29, 2008 there would be difficulty in proving some material

aspects of this case.

**Page 61,    2009 10-K filed December 29, 2009**

Although we are not given precise information by our
customers as to the countries in which infant formula
containing our oils is ultimately sold, **we estimate that
approximately 50%, 52% and 59% of our sales to infant
formula customers for fiscal 2009, 2008 and 2007,
respectively, relate to sales in the U.S.**

**MARTKEK SEC DISCLOSURES FRAUDULENTLY HYPING SIZE OF MARKETS**

**Disclosures of U.S./World wide wholesale formula market.
  (Insider known to be unattainable beyond their partners)**

**2001 10-K       U.S. $2 billion      Worldwide $6-$8 billion**

**2002 10-K       U.S. $3.5 billion    Worldwide $7.5-$8 billion**

**2003 Fraudulently raised Martek's DHA/ARA formula revenue
opportunity to $550 million from the previously claimed
$400 million in their monthly presentations to investors.
The back door private placement method of securing equity
capital had dried up due to a series of undisclosed
failures, barriers and problems that their crony insiders
knew in real time, had to defraud the public securities
markets directly to secure the capital for the undisclosed
problem with toxic air pollution while concealing their n-
hexane, toxic solvent neurotoxin residual processing.**

Raised formula market size

**2003 10-K     U.S. $3-$3.5 Bil     Worldwide $8.5-$9.5 bil**

### Page 8-9 2003 10-K Filed January 29 2004

Mead Johnson Nutritionals, Wyeth, Abbott Laboratories, Nestle, Nutricia, Novartis and Maarbarot and two companies whose identity we have agreed not to disclose at this time, are now marketing term infant formula products containing our oils in over 30 countries and pre-term infant formula products containing our oils in over 60 countries around the world. **The five licensees that are not currently marketing term infant formula products containing our oils represent less than 5% of the estimated worldwide wholesale market for infant formula.**

### Undisclosed lowering of prices to partners

**2006 and 2007 established new supply agreements with their 2 largest partners/customers Mead Johnson and Ross. Did not disclose the material fact that Martek <u>lowered prices</u> to their partners which based on <u>Martek's monopoly like</u> supply position as the only provider of their fraudulently claimed "pure, natural, contaminant free DHA/ARA oils" which were the only ones "approved" for use in the U.S., dropping prices would not fit any arms length business negotiations result. More importantly to investors was the situations/facts, Martek supposedly had 25 year agreements with their partners/customers-why were they signing new supply agreements, second – Martek never disclosed dropping**

their prices and in fact, Martek's typical fraudulent hype
was that there were looking to increase their prices.

2007 10-K     U.S. $3-$3.5 Bil    Worldwide $8.5-$9.5 bil
  Martek claiming U.S. formula market

The 2008 and beyond claimed market size is reflected in
"retail" figures not wholesale as in previous figures.
Martek has always claimed that their DHA/ARA oil prices
regardless of purchasers retail customer, regular vs WIC
sales by their partners, were the same to it's customers,
Martek's formula partners Mead, Ross and Wyeth. WIC or
regular same price/profit to Martek Biosciences was the
claim.

2008 10-K     U.S. $4.5 billion   Worldwide $15 billion
        with 75% signed of worldwide

  Relevant to Martek and it's corporate partners

WIC Food Package Should Be Based on Science:
Foods with New Functional Ingredients Should Be Provided
Only If They Deliver Health or Nutritional Benefits
  By Zoë Neuberger
June 4, 2010

    Excerpts 14 page report, Center on Budget and Policy Priorities

Infant Formula Manufacturers Decide Which Formulas WIC
Offers

This issue is especially salient with regard to infant formula, the
sole or a primary source of nourishment for infants who are not
breastfed. WIC purchases more than half of all infant formula
sold in this country. But under current law governing the WIC
program, infant formula manufacturers —not WIC — decide whether
to offer formulas with new functional ingredients.
While WIC purchases formula at a substantial discount, the
program spent approximately $850 million on infant formula
in fiscal year 2009. [6] WIC uses a competitive bidding
process under which manufacturers offer discounts (in the
form of rebates) to a state WIC program in exchange for
being the sole formula provider to WIC participants in the
state. Such contracts are valuable to manufacturers in part
because they confer a marketing advantage; the WIC brand of
formula is well-stocked and generally gets prominent shelf
placement in grocery stores, which may attract non-WIC
customers who pay full price.

In 2002 and 2003, infant formula manufacturers began offering in
the United States more expensive formulas with new functional
ingredients —docosahexaenoic acid (DHA) and arachidonic acid
(ARA). There is currently no scientific consensus that adding
these ingredients to infant formula offers benefits for healthy,
full-term infants. Manufacturers nevertheless claim these
ingredients provide developmental benefits and market them
accordingly.
When the formula products containing these ingredients were
introduced, USDA left it to each state to decide whether to offer

them. According to the National WIC Association, formula manufacturers heavily lobbied state WIC programs and elected officials — which lacked comprehensive evidence to use to assess the manufacturers' claims — and eventually limited the availability of formula without DHA and ARA. Under pressure to offer the formulas with these ingredients, most states soon began to offer them.[7] The federal government covered the additional cost: when they were introduced, the wholesale prices for these formulas were 7 percent to 30 percent higher than prices for the previously standard formulas, depending on the brand.

A recent study by USDA's Economic Research Service (ERS) found that state WIC programs are spending $127 million more each year in federal funds for infant formula under their *current* contracts with infant formula companies — for formula products with DHA and ARA — than states would have paid under their *previous* contracts, after adjusting for inflation.[11] ERS attributed $91 million of the increase (72 percent) to increases in the price of infant formula beyond the increases needed to keep pace with inflation (the remainder of the $127 million increase reflects other factors).[12] Thus, WIC appears to be spending more than $90 million extra annually — or more than 10 percent of its total spending on infant formula — to provide formulas with ingredients that neither USDA nor the FDA has assessed with regard to their benefits. Costs are likely to rise higher in the future if manufacturers add more ingredients to formula products and increase prices further.

**State WIC Programs Decide Whether to Offer Foods with New Ingredients**

The WIC food package rules implemented in 2009 do not specify whether states are to offer foods with or without functional ingredients; thus, for all foods other than infant formula, state WIC programs decide. A review of published state food lists indicates that currently states are generally not offering baby foods, infant cereal, or eggs with new functional ingredients.[4]

End to-Excerpts 14 page report, Center on Budget and Policy Priorities

The court will find the entire 14 page report as Exhibit G based on a continuation of relevant supporting 3rd party information.

OmegaTech frauds

In addition to the fraudulent misrepresentation of Martek's true or even reasonable true, correct and timely information regarding Martek and it's partners now definable and very commercially limited strategies for their primary target the U.S. formula markets there is yet even more years of fraudulent misrepresentations to Martek's investors based on Martek's 2002 purchase of OmegaTech. The OmegaTech purchase was claimed to be the source of multiple $250 million or better markets to Martek adding a much loved investor fraudulent concept of material diversification to the already fraudulently hyped formula investment growth story.

Exhibit D from February 5, 2011 complaint.

As per the Adams, Harkness & Hill Martek research report dated September 4, 2003, November 1, 2003 beginning of fiscal 2004 for Martek biosciences,  per the price targets section of page 2. Scott Van Winkle, CFA and Jon Fox were <u>conservatively</u> estimating $500 million in revenue which in some of their other reports were broken down as $300 million formula DHA/ARA, $100 million for prenatal/nursing DHA supplements and $100 million for Food and Beverage DHA additives.


Nelson's Broker Summaries via COMTEX (November 17, 2004)

   <u>Provided 17 days into Martek's fiscal 2005 year.</u>

The consensus for 8 analysts as of November 17, 2004 was $1.73 EPS for 2005 and $2.53 for 2006.


Firm: Smith Barney Citigroup

Analyst: Elise Wang

2005 EPS Estimate $1.95 reduced from previous $2.15/share

2006 EPS Estimate $2.60 reduced from previous $2.70/share


The commercial applications and markets Martek Bioscience was fraudulently alleging to investors: $550 million potential for world wide formula DHA/ARA, greater than $250 million for prenatal/nursing DHA which at one time Martek was claiming this

market alone could be larger than formula( the $400 or $550
million claimed take your pick), greater than $250 million was
the food & beverage DHA applications, greater than $250 million
was the regular DHA supplementation market, then there was the
animal feed market which OmegaTech/Monsanto partnership were
working more aggressively and are probably the largest source of
revenue to Martek in it's current claims of doing business in nor
formula DHA markets. In order to further fraudulently manipulate
information, required disclosure, to investors Martek combined
several of their previously claimed different "greater than $250
million applications and markets" into one. Currently Pregnancy
and nursing, nutritional supplements and animal feeds is all one
reporting revenue number which was $10.2 M in 2006, $17.5 M in
2007, $20.8 M in 2008, $28.6 in 2009, $34.8 M in 2010

Food & Beverage 2006 was $1.4 M, 2007 was $5.4 M, 2008 was
$10.4 M, 2009 was $10.7 M, 2010 was $17 M..

Then there was the "pharmaceutical" application investment growth
carrot that was waived before investors which was presented as
more future oriented opportunities based on Martek's "research"
which management presented as opportunities from 2008 and on.

Martek management was "building the billion dollar revenue
company" with "cradle to the grave applications", "with DHA
being  the next calcium". Martek management had analysts

comparing Martek to the "Intel Inside" marketing and growth based on effectively the "same research and development for multiple   $250 to $550 million markets/application of Martek's DHA and ARA product line. Martek management even had investors tweeked about potential separate ARA applications based on their relationship with DSM as Martek's ARA supplier and additional agreements for the development of ARA.

In Merrill Lynch's September 23, 2005, within 5 weeks of Martek's fiscal 2006, <u>initial opinion</u> issued on the 2 year anniversary of Martek's initially undisclosed, September 23, 2003 during the most heavy illegal insider selling, and then fraudulently misrepresented claim of Martek's infringement case against Nutrinova/Lonza Lynch addresses the consensus of Food & Beverage revenue, one of the 4 markets/applications, expectations for 2006 of $256 million and for 2007 of $356 million as being too high.

This statement, Management Outlook, has appeared in each 10-K since 2002, the year Martek bought OmegaTech and has been core to Martek's monthly investor presentations for that 6 year period.

**MANAGEMENT OUTLOOK page 37 2008 10-K filed Dec 29, 2008**
Management believes that over the next few years, non-

infant formula sales will continue to grow and could
ultimately represent a **larger opportunity than infant
formula.**


**The process to fraudulently create Martek's commercial
profile to secure the public market capital to buy and
build capacity without disclosing the true material failure
of Martek's n-hexane, neurotoxin, processing with the
undisclosed accompanying toxic hazardous air pollution
restrictions while fraudulently claiming purity of product
as the primary justification of it's higher price and
demand took years to establish.**

**From 2002 and on Martek has fraudulently proclaimed as one
of it's primary advantages it's claimed purity of product.**

**Even into the 2009 10-K's reporting the fraudulent claim is
in tact.**


Page 21 2009 10-K

We believe that our nutritional oils have the following
advantages over fish oil and other currently available
sources of DHA and ARA for use in infant formula, as food
and beverage ingredients, or as supplements:

- our oils, in general, are easier to formulate than
certain fish oils in food and beverage products;

- our oils can be blended in a variety of mixtures in precise ratios for specific applications, whereas the composition of fish oils may vary;

- each of our oils used in infant formula is comprised of a fatty acid blend that does not contain certain other fatty acids, such as EPA, in significant quantities, which may not be appropriate for consumption by infants at high levels.

- our oils do not contain substances found in certain fish and fish oils such as methylmercury, polychlorinated biphenyls ("PCBs"), dioxins **and other toxic contaminants**;

- our oils have a higher oxidative stability and longer shelf life than certain fish oils and are, therefore, more amenable to the spray drying process required for powdered formula;

-

**In spite of the aggressive fraudulent commercial claims made to Martek's investors, the insiders pay themselves on reality.**

**2010 10-K Amended filed February 25, 2011**

*Annual Incentive Cash Compensation*

*As part of our executive compensation program, we reward the achievement of corporate and individual*

*performance goals through the Bonus Plan. This annual incentive program is designed to reward participants for the achievement of pre-established Company-wide goals and individual contributions thereto by providing cash awards that are paid if such goals are met.*

For 2010, as in 2008 and 2009, the Company's Bonus Plan was structured with two financial objectives and two categories of non-financial objectives. The non-financial categories are comprised of a series of commercial objectives and a series of research and development objectives. Corresponding to the financial objectives as well as each of the two categories of non-financial objectives were ranges of potential cash bonus payouts expressed as a percentage of base salary. The range for the financial objectives was set based upon specific thresholds of achievement. For each category of the non-financial objectives, there was a range of potential payouts with the ultimate payout amount based upon the judgment of the Compensation Committee as to the achievement of the non-financial objectives. The Compensation Committee structured the 2010 Bonus Plan in this manner so that the executives would know what their reward, if any, would be for achieving the financial objectives, while using the non-financial objectives to provide the Compensation Committee with the opportunity to apply its judgment on the value of contributions or achievements that are harder to measure.

The financial and non-financial objectives for 2010 were set prior to the Company's acquisition of Charter Amerifit LLC and all of its subsidiaries ("Amerifit"), and are therefore exclusive of the performance of Amerifit after acquisition. The financial and non-financial corporate objectives and their respective thresholds, if any, and ranges of payout expressed as a percentage of salary for the fiscal year ended October 31, 2010 are as follows:

Bonuses based on minimum results for formula application relative to claims of $400-$550 million opportunity. Effectively bonus themselves on work done for them by their 3 formula partners at $288 million. The non formula revenue component at $40 million, once again relative to the fraudulent commercial claims, is a novelty especially considering that Mead Johnson's EXPECA prenatal and some decent animal feed sales would probably match that figure with little to no possibility of much else.

| Financial Objectives | Minimum | Payout as a Percent |
|---|---|---|

| | In Millions) | age of Salary |
|---|---|---|
| *Infant formula product sales* | $ 288 | |
| *Non-infant formula product sales* | $ 40 | |
| | | } 0-70% |
| Product Sales | $ 328 | |
| Pre-tax earnings for 2010 | $ 64 | |

**Martek insiders knowing, fraudulently, misrepresented, with no required checks and balances enforced by any officer or board member of Martek Bioscineces, every material aspect of Martek Bioscinces commercial viability from 1998 and on to secure Martek's limited commercial applications with their corporate partners Mead Johnson/Bristol Myers, Ross/Abbott Labs, Wyeth and DSM while in the process fraudulently abusing the public securities markets to grossly over fund the insider known limited applications and grossly over compensate Martek's executives and board members which illegally disregarded any and all their legal**

requirements to their Martek Bioscineces investors.


Martek's claimed products were consistently fraudulently
misrepresented to investor with claims of contaminant free
and superiority to comparable cheaper and more established
products already in the market place.


Martek fraudulently claimed unattainable market size of
their formula opportunity and increased that size and
opportunity while the insider known reality was that the
formula revenue ability of their DHA/ARA oils were actually
shrinking due to their undisclosed n-hexane, neurotoxin,
problem and Martek's undisclosed reduction in pricing for
their corporate partners/customers.


Martek fraudulently claimed their need for expensive
massive capacity expansion based on good faith knowledge of
existing growth and future growth in applications and
markets for both formula and adult DHA markets when in fact
Martek was concealing their toxic air pollution and the
neurotoxin residual in their products from investors and
consumers alike. The n-hexane, neurotoxin with more proven
science for harm, was in stark contrast to unproven claimed
neurological health benefit for Martek's DHA and ARA
products.

Martek successful fraudulent claims of the non formula DHA
expectations provided in exhibit D of the February 5
complaint shows professional analysts consensus revenue
expectations of $100 million for prenatal/nursing and $100
million for food & beverage applications for 2006 in a late
2003 report. In a late 2005 report, 2 years later,
consensus revenue for the food & beverage segment alone of
Martek's fraudulently alleged adult DHA market was $265
million for 2006 and $356 million for 2007. In between,
November 2004, analysts consensus report of $1.73 EPS for
2005 and $2.53 EPS for 2006 are issued. Since none of the
actual long list of material failure, barriers, problems
or scenarios were ever disclosed in any of the analysts
reports one can only make two assumptions. Management was
excellent at their ability to defraud or everyone is
playing along to participate in the investment banking
fees. But one thing for sure everyone made money on Martek
but the Martek investors. Martek has never gotten remotely
close to any of those commercial expectations or financial
results and would have probably fallen off it's 2009 high
revenue, without the new AmeriBrand 2010 purchase, of $329
million and the $1.22 EPS both the highest ever, without
tax benefits, since it once again lowered it's prices in
2010.


The purchase of Omegatech it's claimed commercial
viability, synergy to Martek, the use of it's patents in

the Nutrinova/Lonza patent infringement case were all
fraudulently disclosed to Martek's investors.


Martek's core information as a public market investment has
been fraudulently corrupted for alternate profit.

Martek was the source of material structural corporate
changes to occur for Bristol Myers in it's $ 7 billion spin
off of Mead Johnson, allowed Wyeth to sell it's U.S. based
formula assets and business to PBM and allowed Ross/Abbott
Labs to generate much higher profits from it's formula
division potentially making it more appealing for a
potential buyer. DSM added a material new business with
it's ARA production for Martek Biosciences and has added an
additional layer of profit with it's February 2011 purchase
of Martek.

Martek was a smashing success for all peripheral corporate
entities and Martek's long list of executives and board
members all working for those peripheral corporations by
fraudulently abusing Martek's regular public market
investors.

Case # CCB 11cv0316 formerly WDQ 11cv0316
Csabai et al vs. Martek Biosciences/DSM et al
Plaintiff's


_Ferenc K Csabai_ March 23, 2011
Ferenc K. Csabai March 23, 2011

_John D. Miles_ March 23, 2011
John D. Miles March 23, 2011

_Margaret Miles_ March 23, 2011
Margaret Miles March 23, 2011

_David Smith_ March 23, 2011
David Smith March 23, 2011

_Curtis J. Landsberger_ March 23, 2011
Curtis J. Landsberger March 23, 2011

_Michael Scardigno_ March 23, 2011
Michael Scardigno March 23, 2011

_Anna E. Dale_ March 24, 2011
Anna E. Dale March 24, 2011

# In The United States District Court
## For the District of Maryland
### (Northern Division)

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2011 MAR 28 A 10: 36

CLERK'S OFFICE
AT BALTIMORE

BY _KLA_.____DEPUTY

**Csabai et al**
          **Plaintiffs,**

**CIVIL ACTION NO.**

**1:11-cv-00316-WDQ**
**CCM**

**Martek Biosciences Corp/DSM, et al.,**
          **Defendant's**

---

## Certificate of Service

I Hereby Certify that on the 26 of March, 2011,
I caused true and correct copies of my motion to
the legal representation, Hogan Lovells, of said
defendant's. Mark Gately of Hogan & Hartson, Harbor
East, 100 International Drive, Suite 2000,
Baltimore, MD 21202 via first class USPS.


_Fran K Csabai_
**Ferenc K. Csabai**